UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Magistrate No.
10M-1013-JGD

UNITED STATES OF AMERICA

v.

DAVID E. CASTANEDA-CASTILLO

## MEMORANDUM AND ORDER ON
## APPLICATION FOR BAIL

August 17, 2010

DEIN, M.J.

### I. MOTION RELATING TO BAIL

In March 2010, the United States government, on behalf of the government of

Peru, filed a request for the extradition of David E. Castaneda-Castillo ("Castaneda-

Castillo"), a former Peruvian military officer.  Castaneda-Castillo has been charged in

Peru with the crimes of aggravated murder, kidnapping and forced disappearance

arising out of events alleged to have occurred in August 1985 during Peru's battle with

the Shining Path revolutionary organization.  Castaneda-Castillo has been in the

United States since 1991, and has been pursuing an asylum petition since 1993.  The

Immigration Courts' orders denying his asylum petition have been reversed and

remanded by the First Circuit, and the Immigration Courts have recommended that he

be released pending the resolution of his amnesty petition.  Nevertheless, Castaneda-

Castillo has been in custody since September 9, 2005, when he was taken into custody

by the Department of Homeland Security ("DHS").  After the extradition request was filed on March 10, 2010, he was transferred to the custody of the U.S. Marshals where he remains.

The United States has requested that Castaneda-Castillo be held without bail until a determination of extraditability is made pursuant to 18 U.S.C. § 1834. Castaneda-Castillo has moved for bail, arguing that numerous "special circumstances" exist which override the presumption against granting bail in extradition proceedings. For the reasons detailed herein, Castaneda-Castillo's motion for bail is ALLOWED and Castaneda-Castillo shall be released on home confinement with electronic monitoring, and the posting of $15,000.00 cash bail.  After careful consideration of the record in this case, this court finds that Castaneda-Castillo has established the rare special circumstances which warrant bail in an extradition proceeding.  In particular, but without limitation, this court finds that Peru's extensive delay in seeking extradition and the fact that Castaneda-Castillo has been in custody for five years already and faces a lengthy extradition process, coupled with a very low risk of flight, warrant his release at this time.

## II.  **STATEMENT OF FACTS**[1]

### **Overview**

---

[1]   Citations to "App." are to the Appendix attached to the defendant's Application for Bail.  (Docket No. 12).  Citations to "Charges" are to the English translation of the Extradition Request filed by the Government as Exhibit B.  (Docket No. 17).

The extradition request for Castaneda-Castillo arises out of a massacre that is alleged to have occurred in August 1985.  As the First Circuit summarized the facts presented by Castaneda-Castillo in connection with his amnesty petition:

> [Castaneda-Castillo] had been commissioned as a lieutenant in the Peruvian military in 1983.  In January 1985 he was transferred to an antiterrorist unit in an area designated an emergency zone in which the Shining Path was active.  The Shining Path is a revolutionary Marxist organization, well known for its energy and brutality, that has been at war with the Peruvian government for many years.
>
> In August 1985, the military conducted an operation to search for Shining Path members in the village of Llocllapampa in the Accomarca region.  Two patrols, one of them headed by Sublieutenant Telma Hurtado and the other by Lieutenant Riveri Rondon, were to enter the village and conduct the search.  Two other patrols, one of which was led by Castaneda, were assigned to block escape routes from the village.  Castaneda's patrol located itself about three to five miles from the village on either side of a path.
>
> The first two patrols entered the village and there followed a brutal massacre of dozens of innocent villagers, including many women and children.  Castaneda said that he was in radio contact with his base commander but not with the patrols entering the town, and that he did not know when the attack had occurred or that it had turned into a massacre of civilians.  According to Castaneda, he did not learn of the massacre until about three weeks after the operation when he heard that Hurtado had confessed to executing civilians.

Castaneda-Castillo v. Gonzales, 488 F.3d 17, 19 (1st Cir. 2007).

It appears to be undisputed that neither Castaneda-Castillo nor the troops under his command personally engaged in the massacre: rather, his patrol took up a position at a possible escape route to capture anyone fleeing from the village.  (App. Ex. 5, ¶¶ 16-17).  Nevertheless, according to the charges against Castaneda-Castillo which

form the basis of the extradition request (hereinafter "Charges"), Castaneda-Castillo's patrol, along with another patrol, "acted jointly to destroy the terrorists who were allegedly located in the Huancayoc Ravine, an operation which concluded with the murder of more than 69 villagers, including children, elderly persons and pregnant women, of the village of Accomarca[.]" (Charges at 5). In addition, Castaneda-Castillo is charged with the kidnapping and involuntary disappearance of Severino Baldeon Palacios.[2] Specifically, according to the Charges, an eye-witness, Dolores Quispe Quispe, testified that as she and her husband, Baldeon Palacios, "were walking towards their hut in Accomarca, located in Ccarhuayaco, members of the Army had intercepted and stopped them, ordering her husband to carry their bags and to guide them to Pitec, after which date her husband disappeared." (Charges at 6-7). Allegedly Quispe Quispe later found her husband's ravaged corpse in Pitec. (Id. at 7). While Castaneda-Castillo denies any liability, it is asserted in the Charges that his testimony places him at the scene. (Id.). Although its relevance is unclear, the Charges cite to Castaneda-Castillo's statement to the effect that when he came to the area he had ordered his soldiers to shoot at eight persons who ran away in contravention of the army's orders to stop. (Id. at 6).

## History of the Prosecution of Castaneda-Castillo

---

[2] There is some confusion in the Charges. While the Charges initially assert that Castaneda-Castillo is liable for the kidnapping and involuntary disappearance of Filomeno Chuchon Tecsi, this appears to be a typographical error as Chuchon Tesci was allegedly kidnapped by Hurtado, not Castaneda-Castillo. The defendant admits that the "charges should presumably read Severino Baldeon Palacios." (Sec. Suppl. Mem. (Docket No. 20) at 6).

In order to place the filing of the extradition request in context, it is necessary to explain some political events taking place in Peru.  The following brief description is based on Castaneda-Castillo's description of events, and does not purport to be a complete explanation.  (See Sec. Suppl. Mem. (Docket No. 20) at 4-5).

The Accomarca massacre took place in August 1985.  A Congressional investigation and civil and military court proceedings followed.  Castaneda-Castillo was tried by a military tribunal and the charges against him were dismissed.  The dismissal was affirmed by the Supreme Council of Military Justice on April 4, 1989.  (App. Ex. 4).  Hurtado was convicted of "abuse of authority" and sentenced to some years in prison, but was acquitted of the more serious murder charges against him.  (Sec. Suppl. Mem. at 4).

Castaneda-Castillo entered the United States on or about August 29, 1991 with his wife and two daughters on a non-immigrant B-2 visa, and has remained in this country since then without authorization.  (App. Ex. 1 at 2).  Meanwhile, in Peru President Alberto Fujimori came to power, and on June 19, 1995 passed an amnesty law which protected members of the military from further prosecution, including Hurtado.  (Sec. Suppl. Mem. at 4).  "Fujimori, who is now serving a prison sentence primarily for the egregious human rights abuses which he ordered in the 1990's left office in the wake of a bribery scandal in November of 2000.  Peru immediately embarked on a period of national reckoning.  On June 4, 2001, the Comision de Verdad y Reconciliacion ("CVR"), a Truth and Reconciliation Commission on the model of similar commissions in Argentina and South Africa, was created."  (Id. at 5).

-5-

Fujimori's amnesty law was officially nullified on January 11, 2002, and the CVR's final report, which contains a chapter on Accomarca, was made public on August 28, 2003. (Id.).

On January 31, 2005, the Provincial Prosecutor filed a Criminal Complaint regarding Accomarca with the Third Supraprovincial Criminal Court at Lima.  (Id.).  An "Order Commencing the Investigation of a Case" was issued by Judge Walter A. Castillo Yataco on May 31, 2005, which included charges against Castaneda-Castillo. (Id.).  This is "essentially the equivalent of a criminal complaint or indictment" and forms the basis of the Extradition Request.  (Id. at 6).  The Order was issued just a few months before the expiration of the twenty-year statute of limitations which governs the claims made against Castaneda-Castillo.  (Id. at 3).

Three years later, on September 3, 2008, a "Formal Extradition Request" was issued by the Criminal Court in Peru.  (Id. at 2-3).  It was amended to correct some errors on November 4, 2008.  (Id. at 3).  It was not until March 9, 2010 that the United States requested Castaneda-Castillo's provisional arrest.  (Compl. (Docket No. 1)). Thus, no effort to extradite Castaneda-Castillo was made for five years after the case against him was brought in Peru.

## Castaneda-Castillo's Amnesty Application

Castaneda-Castillo applied for asylum in the United States in 1993, alleging that he had been "selectively targeted for murder by the Peruvian Communist Party - Sendero Luminoso (PCP-SL), also known as the Shining Path, which is a Maoist terrorist organization intent upon subverting and overthrowing the legitimate govern-

ment of Peru." (App. Ex. 1 at 1158). According to Castaneda-Castillo, the threats against him were part of Shining Path's "campaign to selectively execute military officers and police officers who have served in the Andean Emergency Zone." (Id.).

Castaneda-Castillo had a hearing before an Asylum Officer in 1999, who found him to be ineligible for asylum, having "determined that Castaneda's testimony was only partially credible, based upon inconsistencies between the written and oral accounts of his activities in Peru, as well as vague and evasive answers he provided regarding his duties as a military officer." (App. Ex. 6 at 2). INS then commenced removal proceedings, which were consolidated with Castaneda-Castillo's asylum petition. (Id.). "On October 4, 2004, the [Immigration] Court denied Castaneda's applications for relief, finding that he was not credible and that he was statutorily ineligible for asylum because he had assisted and participated in the persecution of others in Peru." (Id.). This was appealed to the Board of Immigration Appeals ("BIA"), which affirmed the denial of the asylum application on September 9, 2005. (Id. at 2-3). Castaneda-Castillo was taken into custody by the Department of Homeland Security ("DHS"), which had assumed the duties of the INS. (Id. at 3, & 2 n.3).[3]

_____

[3] Castaneda-Castillo previously had been detained on October 4, 2004 as part of an ICE pilot program to immediately detain all non-citizens denied asylum or other relief in Immigration Court. (Bail Appl. (Docket No. 12) at 4-5). An Immigration Judge ordered him released on $5,000 bond, which order was affirmed by the BIA. The BIA held that there was no error in the Immigration Judge's determination that Castaneda-Castillo "does not pose a danger to the community," and that he "does not represent such a significant flight risk that release on bond is inappropriate." (App. Ex. 10). Approximately three months later, on September 9, 2005, Castaneda-Castillo was again taken into DHS custody when the BIA denied his first asylum appeal and his removal order became administratively final. (Bail Appl. at 5). He has remained in custody since that date.

On September 29, 2006, a three-judge panel of the First Circuit concluded that neither the Immigration Court's finding that Castaneda-Castillo had participated in persecution, nor its adverse credibility finding, were supported by substantial evidence. Castaneda-Castillo v. Gonzales, 464 F. 3d 112, 122, 134 (1st Cir. 2006), rehearing en banc granted, opinion vacated (Dec. 28, 2006).  At DHS's request, that decision was withdrawn, and the matter was reconsidered by the full bench.  (App. Ex. 6 at 3).

In an en banc opinion dated May 23, 2007, the First Circuit again rejected the adverse credibility determination and ruled that in order for the persecutor bar to asylum eligibility to apply to an alien, the alien must have prior or contemporaneous knowledge of the persecution, regardless of whether the objective effect of his actions was to assist in the persecution of innocent villagers.  Castaneda-Castillo v. Gonzales, 488 F.3d at 21-22 (en banc).  The matter was remanded to the Immigration Court to address the relevant inquiry.

On July 14, 2008, the Immigration Court issued its decision, holding that Castaneda-Castillo did not qualify for withholding of removal.  (App. Ex. 6).  The Court found that Castaneda-Castillo did not massacre civilians at Accomarca, although his role in another incident at Accmay was "less clear," as was "what he knew about the massacre at Accomarca, both before and during[.]"  (App. Ex. 6 at 27).  It also found that Castaneda-Castillo had been the victim of threats and attempted assassinations. (Id. at 24).  Nevertheless, the Court concluded that Castaneda-Castillo had "failed to demonstrate that he was persecuted on account of a protected ground or that he has a 'well founded fear' of persecution to qualify for asylum[.]"  (Id. at 30).  In addition, the

Court ruled that Castaneda-Castillo was "similarly barred from receiving withholding of removal based upon the Court's finding that he did not meet his burden of proving that he was not involved in the killing of civilians in Accmay and that he did not know and could not have known that civilians would be, or were being, murdered in Accomarca[.]" (Id.).

Castaneda-Castillo appealed to the BIA.  While that appeal was pending, on October 3, 2008, Castaneda-Castillo requested that the Immigration Court reconsider whether he had to remain in custody while his application was pending.[4]  (App. Ex. 13 at 1).  The Immigration Court found that there had been a material change in circumstances warranting reassessment of the commitment issue in light of its July 14, 2008 decision, which included the express findings that Castaneda-Castillo had been targeted for assassination and that he had not murdered civilians at Accomarca.  (Id. at 7).  The Court found that it was now "abundantly clear following the hearing that the Respondent poses absolutely no danger to any person, in this community, or any other, regardless of what may have transpired in Accmay, Peru in 1985."  (Id. at 8).  In addition, the Court concluded that Castaneda-Castillo "presents no risk of flight."  (Id.) Therefore, on January 6, 2009 the Court ordered that Castaneda-Castillo be released on a $5,000 bond.  (Id. at 9).  The DHS appealed to the Board of Immigration Appeal, which upheld the finding that there had been a material change in circumstances and that Castaneda-Castillo posed no danger to the community.  (App. Ex. 14 at 2).

---

[4]   Prior motions seeking relief from custody had been denied by the Immigration Court.  (App. Ex. 13 at 2-3).

Nevertheless, the BIA remanded the matter to the Immigration Court on the grounds that the bond was in an insufficient amount.  (Id.).  On April 22, 2009, the Immigration Court increased the bond amount to $15,000 "to address the Board's concerns," but confirmed that it was "satisfied that the Respondent will present himself for removal if he is ultimately unsuccessful in his efforts to remain in the United States[.]"  (Id. at 3).  DHS appealed the decision, thereby preventing Castaneda-Castillo from being released.  (See Habeas Petition, Civil Action No. 10-10248-NG at Docket No. 1, ¶ 29).

On May 26, 2009, the BIA issued its decision on the merits of Castaneda-Castillo's appeal.  The BIA held that Castaneda-Castillo was not precluded from seeking asylum as a persecutor, because "there is too slim a reed of evidence upon which to conclude that the respondent had prior or contemporaneous knowledge of the Accomarca massacre."  (App. Ex. 7 at 4).  Nevertheless, the BIA upheld the Immigration Court's conclusion that Castaneda-Castillo did not qualify for asylum because he "failed to establish that his life or freedom would be threatened in Peru because of his membership in [a] particular social group[,]" and because he failed to establish that his fear of harm from the Shining Path was objectively reasonable given the passage of time.  (Id. at 4-5).

Castaneda-Castillo appealed to the First Circuit.  On July 14, 2009, the First Circuit issued a stay of removal pending review.  (App. Ex. 8).  In so doing, the Court ruled that "petitioner has adequately shown that he is likely to succeed in demonstrating that the BIA erred insofar as it determined that he failed to establish a sufficient link between the persecution and his membership in the social group."  (Id.).

The Court further concluded that "given the lengthy history and specific circumstances of this case, petitioner has made an adequate showing that the balance of harms weigh in favor of granting a stay." (Id.).  On February 12, 2010, Castaneda-Castillo filed a Petition for a Writ of Habeas Corpus seeking release from DHS custody, which Petition is still pending.  (App. Ex. 15, Civil Action No. 10-10248-NG).  On March 9, 2010, the United States filed, on behalf of Peru, a complaint for Castaneda-Castillo's provisional arrest with a view toward extradition.  (Compl. (Docket No. 1)).  He was transferred to the custody of the United States Marshals Service on that date.  (Bail Appl. at 4).  He has now been detained for approximately five years.  (Id.).

On April 2, 2010, the Government moved for detention (Docket No. 11) and Castaneda-Castillo moved for release on bond.  (Docket No. 12).  A hearing was held on April 15, 2010 and supplemental memoranda were filed.  On May 12, 2010, this court entered an Interim Order holding that no decision as to detention could be made until the scope of the charges against Castaneda-Castillo were defined, and deferring a ruling until the formal extradition request was made.  (Docket No. 15).  On May 24, 2010, the Government filed the formal request for extradition and charges that had been brought in Peru.  (Docket No. 17).

At the request of the defendant, the matter was continued for additional briefing, and so that the lengthy charges could be analyzed.  On July 1, 2010, a Second Supplemental Memorandum was filed on behalf of Castaneda-Castillo.  The Government subsequently elected not to file any additional material.  Therefore, the detention issue is now ripe for determination.

## III.  DISCUSSION

### A.      Standard for Bail in Extradition Proceedings

"There is a presumption against bail in extradition cases and only 'special circumstances' justify release on bail."  United States v. Kin-Hong, 83 F.3d 523, 524 (1st Cir. 1996) (quoting Wright v. Henkel, 190 U.S. 40, 63, 23 S. Ct. 781, 787, 47 L. Ed. 948 (1903) (other citations omitted)).  "Therefore, a person subject to international extradition may overcome the presumption against bail by presenting clear and convincing evidence demonstrating 'special circumstances' justifying release pending extradition proceedings[.]"  In re Extradition of Nacif-Borge, 829 F. Supp. 1210, 1215 (D. Nev. 1993).  In addition, respondents must "show by clear and convincing evidence that they are neither a risk of flight nor a danger to any person or the community."  United States v. Ramnath, 533 F. Supp. 2d 662, 665 & n.3 (E.D. Tex. 2008) (since both "risk of flight and danger" and "special circumstances" are prerequisites, "a court logically can address either prong first").  Though "bail may be granted in the sound discretion of the district court, the matter should be approached with caution and bail should be granted only upon a showing of special circumstances."  Beaulieu v. Hartigan, 554 F.2d 1, 1 (1st Cir. 1977) (vacating bail order).

"'Special Circumstances' are limited to situations in which 'the justification [for release] is pressing as well as plain.'"  Kin-Hong, 83 F.3d at 524 (quoting United States v. Williams, 611 F.2d 914, 915 (1st Cir. 1979) (additional citations omitted)).  The rationale behind the presumption against bail is that "extradition cases involve an overriding national interest in complying with treaty obligations."  United States v. Taitz,

130 F.R.D. 442, 444 (S.D. Cal. 1990).  The potential for "diplomatic embarrassment" and its "effect on foreign relations" should a foreign fugitive be granted bail and abscond cautions against release.  <u>Id.</u>  Accordingly, the burden of establishing special circumstances for release rests with the defendant facing extradition.  <u>Id.</u> (citing <u>Salerno v. United States</u>, 878 F.2d 317 (9th Cir. 1989); <u>United States v. Leitner</u>, 784 F.2d 159 (2d Cir. 1986)).  <u>See</u> <u>also</u> <u>Ramnath</u>, 533 F. Supp. 2d at 665-66.

The analysis of whether there are "special circumstances" is obviously case specific, and "the list of potential 'special circumstances' is not limited to those previously recognized in published decisions."  <u>In re Extradition of Gonzalez</u>, 52 F. Supp. 2d 725, 736 (W.D. La. 1999).  Nevertheless, it is helpful to recognize that, as the <u>Gonzalez</u> court held, courts have found special circumstances in the following instances:

> 1.     Where the extraditee raises substantial claims showing a high probability of success on the merits.  (*Nacif-Borge*, 829 F. Supp. at 1216; *Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989));
>
> 2.     Where there is no suitable facility in which to detain a juvenile extraditee (*Hu Yau-Leung v. Soscia*, 649 F.2d 914 (2nd Cir. 1981));
>
> 3.     Where there has been or will be significant delay in the appeals process (*In Matter of Extradition of Kirby*, 106 F.3d 855, 863 (9th Cir. 1996); *In re Extradition of Morales*, 906 F. Supp. 1368 (S.D. Cal. 1995); *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979));
>
> 4.     Where the petitioner might lose "all his fortune" if not permitted to complete his participation in a civil proceeding underway at the time of his arrest (*In re Mitchell*, 171 F. 289, 290 (S.D.N.Y. 1909));

> 5.      Where the detainee may suffer a serious health threat while detained (*United States v. Taitz*, 130 F.R.D. 442 (S.D. Cal. 1990); *Salerno*, 878 F.2d at 317);
>
> 6.      Where it is shown the requesting country would grant bail in a comparable extradition case (*In Re Extradition of Nacif-Borge*, 829 F. Supp. 1210 (D. Nev. 1993); *Taitz*, 130 F.R.D. at 447).*
>
> * *But see In re Extradition of Rouvier*, 839 F. Supp. 537 (N.D. Ill. 1993), which held that availability of bail in the extraditing country was irrelevant and could not constitute special circumstances. *Also In Re Extradition of Siegmund*, 887 F. Supp. 1383, 1386 (D. Nev. 1995).

Gonzalez, 52 F. Supp. 2d at 735-36.

Related to the issue of delay in extradition proceedings, courts have found special circumstances when "there is a lack of any diplomatic necessity for denying bail." In re Extradition of Chapman, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006).  Thus, in Chapman, a relevant factor in allowing bail was that Mexico had waited three years before bringing extradition proceedings and had "not made prosecution of this offense a priority."  Id.  Similarly, in Matter of Extradition of Morales, 906 F. Supp. 1368, 1375 (S.D. Cal. 1995), the fact that Mexico waited a number of months to amend its Request for Extradition to correct an obvious flaw, with the result being that defendant had been in custody for seven months in connection with the extradition request, with no end in sight, constituted special circumstances justifying release on bail.

However, "the normal passage of time inherent in the litigation process" does not constitute a special circumstance.  Kin-Hong, 83 F.3d at 525.  Similarly, "the discom-fiture of jail, and even applicant's arguable acceptability as a tolerable bail risk are not special circumstances."  Williams, 611 F.2d at 915 (internal citations omitted).  Courts

have also rejected claims of special circumstances based on the availability of electronic monitoring and home detention to decrease flight risk, Matter of Extradition of Rovelli, 977 F. Supp. 566, 569 (D. Conn. 1997), and the fact that the person's family depends on him or her for financial and emotional support. Matter of Extradition of Russell, 805 F.2d 1215, 1217 (5th Cir. 1986).

In the instant case, Castaneda-Castillo urges the court to consider the totality of the circumstances and order release. As he argues:

> Mr. Castañeda has shown that he merits release on bail under the totality of the circumstances, based on: (1) the length of time (nearly five years) he has already remained in government custody on his immigration matter; (2) the IJ's recent findings that he is not a flight risk or a danger to the community, as well as the fact that his flight would sacrifice not only his pending asylum claim but his wife and daughter's derivative asylum claims, a considerable disincentive; (3) the fact that Mr. Castañeda is not a "fugitive," as that term is commonly understood, but rather has been living openly in the United States for the past nineteen years; (4) the complexity of the issues to be raised in his extradition proceedings, which will result in inevitable delay (e.g., the staleness of prosecution, lack of probable cause to believe that a crime was committed over twenty-five years ago, the effect of the Peruvian military court's prior adjudication, whether extradition is barred by the political offense exception or by international law); (5) a likelihood of success on the merits, given the prior BIA findings and those of the Peruvian military court; (6) the availability of release if he were returned to the requesting country; and (7) lack of a diplomatic necessity to detain him, given the substantial and unexplained delays in prosecuting the extradition request (the Peruvian government waited three years before requesting extradition, and the United States government approximately two years before requesting the provisional arrest warrant). See In re Extradition of Chapman, 459 F. Supp. 2d 1024 (D. Hawaii 2006) (finding special circumstances of "lack of diplomatic necessity" where government of Mexico waited three years before bringing extradition proceeding).

(Suppl. Mem. (Docket No. 14) at 3-4).

Additional facts will be provided below where appropriate.

**B.**    **Analysis of Claim of Special Circumstances**

**Lack of Diplomatic Necessity for Detention**

The most compelling argument in favor of release is the fact that Peru has

obviously not actively pursued this twenty-five year old charge, thereby resulting in a

very lengthy delay.  This court recognizes that the Peruvian government was in turmoil

for years following the events in question, and it may be appropriate to ignore the years

under President Fujimori in assessing the vigor with which Peru intended to pursue this

prosecution.  However, there is no explanation for the three year delay between the

issuance of the Order Commencing the Investigation of a Case on May 31, 2005 and

Peru's Formal Extradition Request on September 3, 2008.  Nor is there any explanation

for the additional two years it took for the United States, on behalf of Peru, to actually

seek Castaneda-Castillo's provisional arrest on March 9, 2010.  For these five years,

Castaneda-Castillo was actively pursuing his amnesty petition, and was incarcerated.

If Peru wanted to locate him, he was easily found.  Even ignoring the fact that charges

were not brought against Castaneda-Castillo until a 20 year statute of limitations was

about to expire, the only conclusion which this court can reach is that Peru has "not

made prosecution of this offense a priority."  Chapman, 459 F. Supp. 2d at 1027.  This

factor weighs very heavily in favor of release.

The Government does not directly address Castaneda-Castillo's urgency

argument other than to contend that "a lack of diplomatic necessity to hold the

defendant without bail" is not a recognized "special circumstance" in the First Circuit. (Gov't Reply (Docket No. 13) at 4-5).  This argument is not persuasive.  Although the First Circuit has never addressed this question, it has not ruled that this factor can never be considered.  Other jurisdictions also have recognized that it is appropriate to evaluate the priority given to the case by the extraditing country, recognizing that "'[u]rgency' is not merely temporal in nature.  Rather the term involves other considerations including importance to the country seeking extradition and foreign policy concerns of the United States."  Russell, 805 F.2d at 1218 (quoting Leitner, 784 F.2d at 161).  Thus, it is appropriate to consider "the importance of the case given the nature of the crime, the risk of flight, and the interests of the countries in extradition." Id.

Here, the Government emphasizes that "Castaneda-Castillo is accused of outrageous crimes that have received national attention in Peru for years."  (Gov't Opp. (Docket No. 11) at 7).  Nothing in this court's decision should be read in any way to minimize the seriousness of the charges brought against Castaneda-Castillo, nor the anguish felt by the citizens of Peru as a result of events which transpired in the war with the Shining Path.  Similarly, this court is very cognizant of the difficulties faced by a country when deciding how to proceed against its own citizens as a result of war-time events.  Nevertheless, the record presented to this court following years of litigation indicates that Castaneda-Castillo was not a principal participant in the events in question and, perhaps more importantly, that Peru did not consider him to be a principal participant.  The record also establishes to this court's satisfaction that

Castaneda-Castillo stands ready to respond to the charge brought against him if required to do so.  Castaneda-Castillo has met his burden of showing that detention is not necessary to satisfy the United States' foreign policy obligations to Peru.

### Availability of Release in Peru

Related to the issue of diplomatic necessity is whether the possibility of release in Peru is available in the event Castaneda-Castillo is extradited.  In other words, in assessing whether Peru would require Castaneda-Castillo to be detained here, it is appropriate for this court to consider how Peru would handle this case.  Castaneda-Castillo has offered evidence that Juan Manuel Elias Rivera Rondon, who "is thought to have played a similar role in the Accomarca operation to [Castaneda-Castillo]" is not in custody, but is currently on house arrest in Peru where he is awaiting trial on charges similar to those brought against Castaneda-Castillo.  (Bail Appl. (Docket No. 12) at 19; see App. Ex. 18).  On November 13, 2008, the Third Supraprovincial Penal Court in Peru declared "viable the request for modification of the Mandate of Detention for Appearance presented by the accused," Rivera-Rondon and decreed in its place a "Mandate of Restrained Appearance to House Arrest."  (App. Ex. 18).[5]

The fact that, if he had been arrested in Peru on the charges presently pending against him Castaneda-Castillo may have been released on bail, further supports the conclusion that special circumstances exist in the instant case that mitigate in favor of release.  See, e.g., Nacif-Borge, 829 F. Supp. at 1221 (where defendant would be

---

[5]   Rivera-Rondon also denied any involvement in the Accomarca massacre and apparently presented evidence in Peru that Lieutenant Hurtado deviated from the original operation plan.  (See App. Ex. 18).

eligible for bail if he had been arrested in Mexico on the underlying substantive offense, special circumstances existed and defendant was entitled to bail pending extradition); Morales, 906 F. Supp. at 1376 (same).  This court recognizes that bail is not guaranteed to Castaneda-Castillo in Peru in light of the seriousness of the charges against him.  Nevertheless, the possibility of bail in Peru on the underlying substantive offense may properly be considered in combination with other factors as contributing to the court's finding of special circumstances justifying bail in this case.  See id.

### **Future Delays**

Castaneda-Castillo argues that the complexity of issues he intends to raise during the extradition proceedings (including , inter alia, the staleness of the prosecution, a lack of probable cause, potential effects of the Peruvian military court's prior adjudication of similar charges, and the barring of the extradition under the political offense exception or international law) will result in inevitable delays of the extradition process.  (See Suppl. Mem. (Docket No. 14) at 3-4).  While standing alone these potential delays would not constitute special circumstances warranting release, this court concludes that, combined with the other factors, they further support the finding of special circumstances.

Some courts have considered the complicated nature of cases, including the likelihood of habeas corpus proceedings and appeals during which the defendant would be incarcerated, to constitute a special circumstance.  See Taitz, 130 F.R.D. at 445-46.  In this case, however, it is difficult to predict how long the extradition hearings will take.  Nevertheless, the extensive amount of time Castaneda-Castillo has already

been incarcerated, despite several orders granting him bail, leads this court to conclude that a delay of even months in resolving the extradition issue further supports a finding of special circumstances warranting the granting of bail.

The Government argues that Castaneda-Castillo should not benefit from the delays engendered by his decision to contest deportation, especially since he has never prevailed on his amnesty claim.  While this argument may be persuasive in cases where a defendant has merely stalled for time, that is not the situation here.  The fact that the defendant has been incarcerated for so many years during which time Peru could have sought extradition is, in this court's view, very relevant.

The record before this court indicates that through his perseverance Castaneda-Castillo has been able to convince the BIA that he was not involved in the massacre as originally charged, and that his character is such that he does not pose a danger to the community or a risk of flight.  Moreover, Castaneda-Castillo has, in fact, prevailed before the First Circuit.  He has progressed to a more likely finding that amnesty should be granted than existed when the process first began.  Without analyzing every statement Castaneda-Castillo has given over the years, Castaneda-Castillo appears to have remained substantively consistent.  On the other hand, despite numerous opportunities to do so, the Government has not put forth evidence in the Immigration Court to establish that Castaneda-Castillo participated in or was aware of the massacre.  Thus, while Castaneda-Castillo's deportation proceedings have been protracted, it does not appear that Castaneda-Castillo was improperly delaying matters. The fact that Castaneda-Castillo could have avoided the years of detention if he agreed

to deportation is simply not relevant here.  <u>Compare</u> <u>Doherty v. Thornburgh</u>, 943 F.2d

204, 212 (2d Cir. 1991) (eight year detention during deportation proceedings did not

violate alien's due process rights where delay caused by strategic choices; "from the

outset of his detention, Doherty has possessed, in effect, the key that unlocks his

prison cell.  That is, if Doherty had agreed to deportation in the first place, he would not

have been detained . . . for the past eight years").  On the other hand, while the

Government's objections to having Castaneda-Castillo released on bail while the

amnesty issue was progressing do not appear frivolous, in hindsight, they do not

appear to have been justified.[6]

Thus, the question remains as to whether the anticipated schedule for the

upcoming extradition proceedings rises to the level of special circumstances justifying

release.  There is no question that the extradition will be disputed, and Castaneda-

Castillo has made it clear that he intends to challenge the Government's showing of

probable cause, and to raise a number of legal issues which will be discussed briefly

below.  It is not clear at this point how much evidence would be appropriate on the

issue of probable cause beyond the Charges.  However, in light of the fact that

Castaneda-Castillo is charged with kidnapping an individual everyone agrees he had

no contact with (<u>see</u> note 2, <u>supra</u>), and there is some indication that Castaneda-

---

[6]   Castaneda-Castillo has raised the suggestion that his continued detention may
violate due process rights he may have.  In light of this court's decision, that issue does not
have to be resolved at this time.  In any event, however, in this court's view, despite the
lengthy deportation proceedings, Castaneda-Castillo "has not demonstrated the invidious
purpose, bad faith or arbitrariness necessary to make out a denial of substantive due
process."  <u>Doherty</u>, 943 F.3d at 212.

Castillo is being charged with direct participation in the massacre, despite the

agreement by all that neither he nor his troops were directly involved, it appears that

the probable cause hearing may be somewhat protracted.  Moreover, evidence beyond

the Charges may have to be translated from Spanish, and there have been years of

immigration proceedings which may have to be reviewed.  There is little doubt that the

issue of extradition will not be resolved for at least a year, if not more.[7]  Consequently,

this court finds that there has been and will likely be "undue delay" in resolving

Castaneda-Castillo's status, which constitutes special circumstances justifying

Castaneda-Castillo's release on bail.  See Morales, 906 F. Supp. at 1375 (where alien

had been detained for seven months after which Mexico amended its request for

extradition so that the process was to start from the beginning, special circumstances

existed justifying release on bail); Taitz, 130 F.R.D. at 445-46 (fact that complicated

fraud case involving 434 counts will take a number of months, if not years, to resolve,

among the facts the court relies on in finding "special circumstances" warranting

release on bail); In re Extradition of Santos, 473 F. Supp. 2d 1030, 1037-38 (C.D. Cal.

2006), and cases cited (likely delay due to concurrent proceedings which had to be

resolved in Mexico and likelihood of appeals constituted special circumstances);

Chapman, 459 F. Supp. 2d at 1027 (factors resulting in finding of special

---

[7]    This court notes that Hurtado, who it appears actually engaged in the massacre and was convicted in Peru of at least some crimes arising out of the event, was provisionally arrested in Florida for extradition to Peru on August 29, 2008, but had not been extradited at least as of March 2010.  See In re Extradition of Hurtado, 622 F. Supp. 2d 1354, 1355 (S.D. Fla. 2009); Hurtado v. United States Attorney General, 367 Fed. Appx. 969; No. 09-12188, 2010 WL 724167 (11th Cir. March 3, 2010) (affirming BIA's removal order and denial of asylum petition).

circumstances include fact that the "underlying offense occurred more than three years

ago, [so] it may be difficult to track down witnesses and prepare evidence for the

hearing").  Given the history of the case to date, the inaccuracies in the Charges and

the complexity of the evidence which the parties will likely seek to introduce even in the

most stream-lined extradition hearing, Castaneda-Castillo does not face a "normal

passage of time inherent in the litigation process," Kin-Hong, 83 F.3d at 525, but,

rather, a far more extensive process which rises to the level of special circumstances.

## Likelihood of Success

Castaneda-Castillo argues further that there is a high likelihood that he will

prevail in blocking his extradition.  Castaneda-Castillo claims, among other things, that

there is insufficient evidence to establish probable cause, the principle of double

jeopardy applies, and that the offenses for which extradition is sought fall within the

political offense exception barring extradition.  (See Bail Appl. (Docket No. 12) at 15).[8]

As detailed below, this court is not able to make an assessment as to the merits of

these arguments.  However, it is clear that Castaneda-Castillo has raised serious

issues which will require briefing and detailed analysis by the court.

### 1.    Probable Cause

Castaneda-Castillo argues that the government will be unable to establish

probable cause because the submitted extradition packet "tends to rel[y] on unfounded

---

[8]    Castaneda-Castillo also contends that he may raise a statute of limitations
defense, but in subsequent pleadings he acknowledges that the appropriate documents were
filed in Peru months before the statute of limitations expired.  (See Sec. Suppl. Mem. (Docket
No. 20) at 3).

assertions," contains "internally inconsistent" statements, and "cannot constitute 'such evidence as would be sufficient to justify the committal for trial of the person if the offense had been committed in the Requested state'" as required by Article VI(3)(c) of the Extradition Treaty.  (See Sec. Supp. Mem. (Docket No. 20) at 2).  "The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings."  Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir. 2006), accord Gonzalez, 52 F. Supp. 2d at 736.  "Thus, the magistrate's role is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."  Hoxha, 465 F.3d at 561 (internal quotations omitted).  "[T]he government must show evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."  Gonzalez, 52 F. Supp. 2d at 736 (internal quotation omitted).  "The probable cause determination may rest entirely on hearsay, . . . and depositions, warrants or other papers are admissible at the hearing if properly authenticated and admissible in the requesting state."  In re Gambino, 421 F. Supp. 2d 283, 315 (D. Mass 2006) (internal citations and quotation omitted).  However, the probable cause requirement is not "toothless," and evidence submitted must be both "sufficiently reliable and of sufficient weight to warrant the conclusion" that probable cause exists."  Id. at 316 (internal citation and quotation omitted).

At this juncture, it is premature to determine if Castaneda-Castillo is likely to prevail on his probable cause challenge.  Admittedly, there appear to be inconsistences in the Charges, and the translation provided is awkward at times.  Nevertheless, the

probable cause inquiry is limited.  Moreover, as of now, it is unknown whether the

Government intends to introduce any additional evidence, or if Castaneda-Castillo

intends to introduce evidence.  Any evaluation as to whether the Government will meet

the probable cause standard is pure speculation.  See Kin-Hong, 83 F.3d at 525 ("The

factual record will be further developed at the extradition hearing and it is premature for

this court to consider the merits of [the defendant's] claims.").  Therefore, this factor

does not rise to the level of a special circumstance warranting the granting of bail.

## 2.   Double Jeopardy

Castaneda-Castillo argues that it is "questionable whether the prosecution will

be able to demonstrate that the current charges against [him] are justiciable under the

law of Peru, given the fact that he was previously tried and acquitted of the same

charges by a Peruvian military court in the 1980s."  (Bail Appl. (Docket No. 12) at 16).

This defense was rejected in the extradition proceedings of Telmo Hurtado, who was

charged with actually participating in the massacre.  See In re Extradition of Hurtado,

622 F. Supp. 2d 1354, 1356 (S.D. Fla. 2009).  The Hurtado court concluded that

"[b]ecause the treaty between the United States and Peru calls for double jeopardy

protection only if the respondent has been convicted or acquitted by the requested

state, here the United States, double jeopardy is not a defense to the extradition of

Hurtado who was tried and acquitted in the requesting state, Peru."  Id.  Similarly, the

Hurtado court ruled that Article 14(7) of the International Covenant of Civil and Political

Rights ("ICCPR") is not judicially enforceable, and does not provide a defense to

extradition.  Id. at 1356-57.  Nevertheless, the First Circuit has not addressed the

double jeopardy issue, and Castaneda-Castillo appears to rely on other treaties to which the United States is a party.  (See Bail Appl. at 16).  Thus, while this court is not prepared to preclude Castaneda-Castillo from raising a double jeopardy defense, his chances of succeeding on such a defense are not so great as to create a special circumstance justifying release.

### 3.   Political Offense

Article IV(2) of the United States' treaty with Peru provides that "extradition shall not be granted if the offense for which extradition is requested constitutes a political offense."  (Extradition Treaty (Docket No. 1-2) at 4).  "In the few cases where United States Courts have denied extradition under the political offense exception, the petitioner has demonstrated circumstances involving an actual violent uprising, where the victim of the crime was a *combatant*."  Matter of Extradition of Koskotas, 127 F.R.D. 13, 20 (D. Mass. 1989), and cases cited (emphasis added).  Castaneda-Castillo argues that he will "establish that the offense in question is a 'political offense'" operating to bar extradition under the treaty with Peru.  (Bail Appl. at 17).  At this juncture, his likelihood of success on this argument is not so clear as to rise to the level of special circumstances warranting his release.

"To fall within the political offense exception, [Castaneda-Castillo's] alleged actions must have been incidental to or in furtherance of a violent political uprising in Peru."  Ordinola v. Hackman, 478 F.3d 588, 599 (4th Cir. 2007).  While there is little doubt that "[t]he Peruvian government and the Shining Path were engaged in a violent struggle for the control of the country," id., not all actions undertaken by military officers

during the conflict were "incidental to or in furtherance of" the conflict.  See id. at 602-04 (rejecting political offense defense for military officer charged with indiscriminate killing of non-combatant civilians).  The viability of this defense cannot be determined absent a fact-specific inquiry which, like the probable cause analysis described above, must await further development of the record.

### C.   Risk of Flight and Danger to the Community

In light of the special circumstances described above, this court must determine whether Castaneda-Castillo poses a serious risk of flight or danger to the community. See Nacif-Borge, 829 F. Supp. at 1216 (after finding of special circumstances, court examines risk of flight).  This court finds that he does not.

The record is clear that the Immigration Court found at various stages that Castaneda-Castillo did not pose a risk of flight or danger to the community and the Government does not challenge those findings here.  Rather, the Government argues, in connection with the immigration proceedings Castaneda-Castillo was seeking to remain in the United States, and the present situation is no longer comparable.  The Government contends that "considering his demonstrated lack of success in resisting removal since 1993 – resulting in his most recent order requiring removal – coupled with the likelihood that he will be extradited to Peru to face severe criminal charges, Castaneda now has every reason to flee to avoid surrender to Peru."  (Gov't Reply (Docket No. 13) at 5).  This court disagrees.

As an initial matter, the issue of whether Castaneda-Castillo poses a risk of flight has always been relevant to the time if and when an adverse decision is made

requiring his removal.  History has proven that Castaneda-Castillo is willing to continue

to fight to stay in the United States as long as possible.  The Immigration Court

believed that despite his set-backs in the deportation process, Castaneda-Castillo

would not flee but would remain and fight here, and that he would "present himself for

removal if he is ultimately unsuccessful in his efforts to remain in the United States[.]"

(App. Ex. 14 at 3).  This court sees no reason to reach a different conclusion.  Not only

has Castaneda-Castillo consistently affirmed during his amnesty proceedings that he

would defend himself in Peru if necessary, but the record shows that he was released

on bond for a brief period in 2005 when a warrant for his arrest had been issued in

Peru, yet he did not flee.

There is no evidence in the record to indicate that Castaneda-Castillo has the

ability or the resources to "disappear."  His family has been here since 1991, and they

have created a life here.  He has a grandson who is an American citizen.  While

Castaneda-Castillo has ties to Peru, there is obviously no concern that he will flee

there.  There is no evidence in the record that he has ties anywhere else.

As noted above, Castaneda-Castillo faces a lengthy extradition proceeding.

This court believes that his record establishes that he will stay in the United States to

pursue all available options, and will stay to take advantage of his family's support.  If

ordered to return to Peru, this court accepts the Immigration Court's conclusion that

Castaneda-Castillo will return despite the threats of the Shining Path.  Moreover, as

evidenced by the fact that Rondon is on house arrest for similar alleged war crime

charges in Peru, it does not appear that the threat to Castaneda-Castillo from

prosecution of the instant offenses is so severe that he would flee to avoid presenting his evidence in Peru.  In sum, this court concludes that Castaneda-Castillo does not pose a serious risk of flight or danger to the community.

### ORDER

For the reasons detailed herein, this court finds that special circumstances exist warranting Castaneda-Castillo's release on electronic monitoring and a $15,000 cash bond.  A hearing will be scheduled to address whether additional conditions are appropriate.

___/ s / Judith Gail Dein_____

Judith Gail Dein
United States Magistrate Judge
